BERNABÉ SABALIER, Plaintiff and Appellee, *v.* SANTIAGO IGLESIAS-PANTÍN and BANK OF SAN JUAN, Defendants and Appellants.

No. 3222. Argued November 14 and 15, 1924.—Decided June 19, 1925.

1. CONTRACT—FRAUD—CORPORATION—PRINCIPAL AND AGENT—PLEADING.—A complaint charging a corporation with fraud through acts of its president is not sufficient if it does not allege that the president acted within the powers of the corporation and within the limits of his office.

2. ID.—ID.—ID.—ID.—Subsection 2 of section 1362 of the Civil Code does not prohibit the purchase of property by a corporation because of the fact that the agent of the vendor is a stockholder of the corporation.

3. ID.—ID.—ID.—ID.—THIRD PERSONS.—Although the powers of an agent may be limited by private instructions of the principal, such instructions do not affect third persons who have no knowledge of them.

4. ID.—ID.—EVIDENCE.—The testimony of a defendant, although interested, should be given credit unless some legal reason or facts are presented to destroy it, and in the absence of these he is entitled to the benefit of any reasonable theory compatible with honesty.

5. ID.—ID.—ID.—BURDEN OF PROOF.—Although fraud may be shown by the circumstances, it should not be presumed, and the burden of proof falls on the party who alleges fraud.

6 ID.—ID.—A judge should not be impressed by a charge of fraud to the extent of exalting the importance of every fact on which suspicion may be raised of its having been committed and disdaining more logical deductions compatible with good faith.

First District Court of San Juan, Charles E. Foote, J. Judgment in an action for the annulment of a contract sustaining the complaint and dismissing the counter-complaint. *Affirmed in part.*
*Leopoldo Feliu, Bolivar Pagán, José Soto Rivera, R. Sancho Bonet* and *Angel Arroyo Rivera* for the appellants. *Francis H. Dexter, R. Rivera Zayas* and *L. Abella Blanco* for the appellee.

MR. JUSTICE FRANCO SOTO delivered the opinion of the court.

This action was brought by Bernabé Sabalier for the annulment of a contract for the purchase and sale of a certain real property called Melilla. The contract was agreed upon by Santiago Iglesias, acting as the attorney in fact of the plaintiff, and the Bank of San Juan, represented by its president Abraham Peña.

The essential ground of the complaint is fraud, it being alleged that Iglesias and the Bank of San Juan, acting by its said president, resorted to simulations and false representations in order to obtain the consent of Bernabé Sabalier to the contract.

The language of the complaint referring to the simulations or false representations is as follows:

"8.—That the said Abraham Peña Romero and Santiago Iglesias Pantín, the former acting as president of the corporation known as the Bank of San Juan and the latter acting individually and also as the general attorney in fact of Bernabé Sabalier, without the knowledge of the plaintiff and resorting to false and fraudulent simulations, agreed, combined and conspired between them to carry into effect the purchase and sale of the Melilla property hereinbefore described, which belonged to the plaintiff, and, deceiving him by means of insidious artifices and words, induced him to put his signature at the foot of a letter or private document offering for sale the said Melilla property by making him believe, without allowing him to read the said document, that it referred to labor matters

of the American Federation of Labor, and under that belief and trusting in the good faith of his attorney Peña and his attorney in fact Iglesias, he signed the said document without knowing its contents and ignorant of the fact that it referred to the sale of his property, and by these deceitful means the said Peña and Iglesias obtained his consent to the said sale, which was made by deed No. 40 of May 22, 1920, executed before the late notary Antonio Trujillo Guill of this city.''

As two other causes of action it was averred also (1) that Santiago Iglesias and his wife were stockholders of the Bank of San Juan and (2) that this corporation had certain connections with another corporation called ''Corporación Editora de Justicia'' of which Santiago Iglesias and Abraham Peña were president and secretary respectively.

By these last allegations it was sought to bring the case under subdivision 2 of section 1362 of the Civil Code which forbids agents from acquiring, either in person or by an agent, property the administration or sale of which may have been entrusted to them.

The defendants first demurred on the ground that the complaint did not state a cause of action and then answered. The trial court overruled the demurrer and, after a long and tedious trial covering several weeks, declared the contract a nullity and ordered the restitution of the property to the plaintiff. At the same time it dismissed the counter-complaint of defendant Iglesias wherein he claimed payment for services rendered as attorney in fact of the plaintiff.

The defendants appealed and assigned numerous errors in their respective briefs; but as a whole they are almost similar in substance and all may be summed up in three groups, viz.: That the court erred (1) in overruling the demurrer on the ground of failure to state a cause of action; (2) in the admission of certain evidence, and (3) in weighing the evidence and applying the law and the jurisprudence.

It is alleged by the appellants that the complaint does not charge the Bank of San Juan with fraud and that the

prohibition of subdivision 2 of section 1362, *supra,* is not applicable to this case. And the bank contends also that it is an innocent third person.

[1] There is no allegation in the complaint which mentions the Bank of San Juan in connection with the fraud except the 8th count that we have transcribed. In it the said defendant is charged with fraud only through acts of Abraham Peña acting as president of the corporation. The complaint is against the Bank of San Juan as a corporate body and according to our Corporations Law "the business of every corporation shall be managed by its directors * * *." Section 11 as amended by Act No. 24 of April 13, 1916.

"Directors are only the agents of the corporation to conduct its business, and are not the corporation, and as directors merely they have not a shadow of interest in the corporate property, * * *; they are only the persons by whom the corporate powers, business, and property are to be exercised, conducted and controlled. The authority of the directors or trustees is conferred upon them as a board, and they can bind the corporation only by acting together as a board; * * *." 7 R.C.L. 439.

"An individual director has no general authority to make contracts for the corporation, and there is no presumption that a contract purporting to be made by him was authorized by the corporation, even though he owns a majority of the corporate stock." 7 R.C.L. 440.

It seems, therefore, that these considerations respond to the *sui generis* creation of every corporation. A corporation is an artificial, indivisible, intangible organism existing only in contemplation of law, as defined by Chief Justice Marshall in the celebrated case of *Dartmouth College v. Woodward,* 4 U. S. (L. ed.) 629, 659. And by reason of its intangible appearance all of its acts must be performed in its corporate name by its agents, but always within the powers and purposes of the corporation. This is one of the material differences that distinguish it from the other

ordinary copartnerships whose members act as natural persons and as agents of each other.

For this reason the general rule applicable to corporations when they are charged with fraud has been defined by the authorities as follows:

"Subject to some difference of opinion in the earlier cases as the particular remedy available, the general rule is well settled that a corporation is in the same manner as a natural person responsible for the fraud of its agent when acting within the power of the corporation and within the scope of his agency." 14 C.J. 775, sec. 2845.

The complaint shows on its face, and especially the 8th count of it charging the defendants with fraud, that although it is alleged that Abraham Peña was acting as president of the bank, it is not averred that he acted within the powers of the corporation or within the scope of his office.

The 6th count of the complaint recites the matters of business in which the Bank of San Juan may engage and does not include among them its power to acquire real property.

There are decisions to the effect that the authority of the president of a corporation can not be presumed as a matter of law and that as such agent he has no inherent power to purchase property for the corporation. 7 R.C.L. 453.

A similar doctrine has been established by this Supreme Court in the case of *Turner* v. *Registrar*, 22 P.R.R. 535, in which it was said:

"The general rule on the subject admits of no misunderstanding. The affairs of a corporation are almost universally managed by a board of some kind elected by the stockholders. 10 Cyc. 787, note 72. It is the board of directors which is the agent that corresponds to the managing partner of a partnership. No officer, as a general rule, has the administration or the sale of the property of a corporation by the mere fact of being such officer, as is the case with the

managing partner of a partnership under the law itself. It is suggested that as a board is composed of its directors of whom the president of the corporation is almost universally one, the prohibition extending to the whole board extends to each of its constituent parts. In answer to this suggestion it may be noted that a single director cannot order the sale of the corporation's property without the consent of the other directors. The agency, the controlling voice, is not complete without the action of the whole board, generally obtained after a meeting duly called. The sale of the property of a corporation, too, very frequently can only be made by notice to the stockholders. In case of a partnership the will of the managing partner controls the firm as a matter of law. This is not the case with the president of a corporation.''

The mere fact, therefore, that Abraham Peña was the president of the Bank of San Juan is not sufficient to make the said bank responsible for the individual acts of the said Peña in connivance with defendant Iglesias.

''Still the president of a corporation when acting for the corporation is merely its agent and cannot act so as to bind the corporation beyond the scope of his authority, and the fact that he owns a majority of the corporate stock does not itself vest him with any additional authority.'' 7 R.C.L. 450.

However, we do not wish to say, nor would it be possible to hold, as one of the appellants contends, that the corporation must have ratified the contract and, furthermore, that its ratification must have been made ''with knowledge of the fraud.'' The cases cited by the said appellant hold the contrary under the rule of *respondeat superior.* This doctrine is applied to the liability of corporations for the acts of their agents. *Henderson* v. *San Antonio &c. R. R. Co.,* 67 Am. Dec. 675–78. For a better illustration of the subject, the following citation is made in that case:

''Story, in his treatise on agency, thus states the law upon the subject of the liability of the principal for the misfeasances, negligences, and torts of his agents, as deduced from the adjudged cases: 'It is a general doctrine of law, that although the principal is not ordinarily liable (for he sometimes is) in a criminal suit for the acts or misdeeds of his agent, unless, indeed, he has authorized or

co-operated in those acts or misdeeds, yet he is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances or misfeasances and omissions of duty of his agents in the course of his employment, although the principal did not authorize, or justify, or participate in, or indeed know of such misconduct, or even forbade the acts or disapproved of them. In all such cases the rule applies, *respondeat superior;* and it is founded upon public policy and convenience; for in no other way could there be any safety to third persons in their dealing, either directly with the principal, or indirectly with him through the instrumentality of agents.` In every such case the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of his agency.' Story on Agency, secs. 452, 127, 135, 137.''

But this doctrine is applicable to corporations whenever the act or contract done or made by the agent is within the powers of the corporation and the authority or scope of the agency, and those facts have not been alleged in the complaint. As regards the scope of the agency, the Civil Code states clearly the reason for the rule, as follows:

''Sec. 1619.—When an agent acts in his own name, the principal shall have no action against the persons with whom the agent has contracted, nor the said persons against the principal.

''In such case, the agent is directly liable to the person with whom he has contracted, as if the transaction were his own. The case involving things belonging to the principal is excepted.

''The provision of this article shall be understood without prejudice to actions between principal and agent.''

Likewise, the allegations of the second and third causes of action are not sufficient.

[2] It is alleged that Iglesias and his wife were stockholders of the Bank of San Juan and that this corporation in turn had business associations with the ''Editora de Justicia'' corporation, of which Iglesias and Peña were president and secretary respectively. The point raised was that as Iglesias was Sabalier's agent and Peña was his lawyer and the selling and purchasing agent, they purchased for

themselves when they made the sale in the name of the bank.

On this point in the case of *Turner* v. *Registrar, supra,* this court established a distinction between partnerships and corporations and held that the president of a corporation does not come within the prohibition of section 1362, *supra.*

The same doctrine was ratified later in the case of *Rosenstadt & Waller, Inc.,* v. *Registrar,* 23 P.R.R. 269–70.

The reason for this jurisprudence is that a corporation, as an artificial creature of the law, is distinct from its members or stockholders. Their individuality disappears and is absorbed by the corporate capital, and they are neither individual nor joint owners of its property. It has been said by the authorities that neither a part nor all of the natural persons who compose a corporation, or who own its stock or control its business, are the corporation itself, and if a single individual forms a corporation, he himself is not the corporation. In such a case the man is one person and the corporation is another. *Exchange Bank of Macon* v. *Macon Const. Co.,* 97 Ga. 1, 25 S. E. 326, 33 L.R.A. 800.

The complaint, therefore, is not sufficient in any of its three causes of action and the trial court erred in not sustaining the demurrer of the defendants.

Nor is the evidence sufficient to support the complaint or the conclusions stated in the opinion of the trial court.

In examining the merits of the evidence we shall consider incidentally the assignments that refer to the admission of certain evidence and thus the assignments of the second and third groups will be discussed together and according as the order in which matters must be presented may require, although we may anticipate that under the general rule of latitude followed in the admission of evidence in cases of fraud, for the reason that the jurisprudence is unanimous in requiring in such cases strong, clear and convincing proof, the objections of the defendants are

unimportant, for they refer to the weight or probatory value of the evidence rather than to its pertinency.

(*a*) Notwithstanding the cumulus of details and facts attempted to be proved in this case as a net woven by the defendants for the alleged purpose of ensnaring and deceiving the plaintiff and defrauding him of his rights, the fact is that the fundamental question seems to turn on exhibit J which appears to have been executed on April 30, 1920. It reads as follows:

"Compañía Editora de 'Justicia.'—Authorized capital $30,000.— April 30, 1920.—Memorandum for Bernabé Sabalier.—We have an offer for making a good bargain in connection with the sale of the lots through the Banco de San Juan at a price possibly above twenty thousand dollars ($20,000). At the same time, the mortgages owing to the Banco Popular will be paid from this sum.—The Banco de San Juan will pay us 6% interest annually on mortgages, paying the instalments monthly.—As the promissory notes of $3,000 each are collected houses of concrete will be built for renting.—This transaction is convenient, especially in view of the necessity of avoiding the increase in taxes, the payment of interest to the Banco Popular and the improvements that must be made in this part of Santurce when the Municipal and Insular Governments reconstruct the ward of Melilla after the construction of the roads and the sewerage system.—As we are not going to increase the rents or make difficult transactions with the poor who represent a majority of the occupants of these lots, we think it well that a financial organization should undertake this enterprise. This is better than selling individual lots at low· prices.—The house in which Bernabé Sabalier is living will be rebuilt at a cost of $1,000 or more.—The interest that the bank offers to pay will give a sum sufficient for the living needs of Bernabé Sabalier.—We agree.—(Signed) Bernabé Sabalier.—Santiago Iglesias."

The plaintiff admits having signed this document, but contends that he was induced to do so by Santiago Iglesias and Abraham Peña, the latter acting as president of the Bank of San Juan and making him believe, without reading to him or permitting him to read the document, that it referred to affairs of the American Federation of Labor.

The most salient parts of the testimony of five witnesses who testified in this connection are as follows:

The plaintiff himself said:

"In the month of January of this year two particular things occurred to me: The first was when he alone brought a document for me to sign—a typewritten document, I did not read it; he would not let me read it. * * * With regard to this document, Iglesias told me that it was for the funds of the International. * * * I signed it; I signed it because he came and put the paper before me. I know that it was typewritten, and as I trusted him I signed it; * * *.

"What I heard him say about the Unionists was about six days thereafter, when he came and I said to him: 'For God's sake, I am tired of signing documents', and he replied: 'This is necessary because the Unionist Party will take charge of the government on the 1st and it is necessary to secure that property, which is not safe.' He wanted me to sign, but I was tired of signing and I could not sign because of the pain in my arms, as I suffered from cramp, and I called: 'Goyo, come here and sign this at my request', and you (addressing Iglesias) said to me no and took my hand and compelled me to sign. That is the truth before Almighty God.

"Peña was there with Santiago Iglesias; they always went together. After I signed I observed that when he went out he asked: 'Well, did he fall for it?' 'He did.'

"When Iglesias went out after obtaining the signature Abraham Peña was coming up. I was still in pajamas and could not go out. What I did hear was when Peña asked: 'Did he fall for it?' and he replied, 'Yes.' I do not know whether Peña said it in a low voice, but I know that I heard it. That was in January of this year.

"What he said to him (Peña to Iglesias) * * * in the balcony or outside, the fact is that he was not beside me and Iglesias, but outside. I do not know whether Peña was on the balcony; I know that he was outside.

"I can recollect that this document was signed in January of this year because he took it to my house and I saw it. He (Iglesias) told me that it was for the International * * *.

"This paper that I am being shown, marked Exhibit J. That signature there is also mine."

Gregorio Torres, a foster-child of the plaintiff, testified:

"One morning Iglesias and Abraham Peña came in an automobile with a document to be signed which was to secure his property for the future, because if he did not secure it the Unionist Party which was about to come into power would leave him a pauper; and my father (sic) came and called me to come and sign the document and Iglesias refused to let me sign   *   *   *.

"They did not permit me to read the document, nothing absolutely; because Iglesias did not want me nor the old man to see the document.   *   *   *

"What occurred was that after my father (sic) signed Iglesias took and wrapped the document and went downstairs followed by Abraham Peña, who asked: 'What about it?' And Iglesias replied: 'He fell for it.'" Later this same witness said:

"I do not know whether Abraham Peña asked Iglesias anything, as they went away."

Antonia Encina testified that she was present when Iglesias took a paper for Sabalier to sign and that the only thing she heard was, "sign these papers; it is for your benefit," and that she left.

Justo Quiñones testified that he had a shop in front of Sabalier's house and that one morning, while he was standing on the sidewalk in front of his store, he saw Iglesias and Peña coming in an automobile; that Iglesias went in and Peña remained in the automobile, but afterwards got out and was approaching the house when Iglesias was coming out, and when Peña asked him whether he had obtained the signature Iglesias replied that he "fell for it." He said that the voices of Iglesias and Peña were so loud that he could hear them.

This witness testified also that he had disagreements with Iglesias because the latter had opposed his obtaining a lot in the Melilla property involved in the suit.

Arcadio Saldaña testified to the same effect, but to the words "he fell for it" he added another which he says was uttered, but it being an indecent word, it is unnecessary to repeat it.

This is all of the the direct evidence tending to establish the fraud.

If the theory of fraud requires strong and satisfactory evidence that should leave no doubt in the mind of the trier, we are obliged to say that the evidence in this case is not of that character.

Sabalier was deaf and could not hear a conversation carried on in low tones. He complains that one of the things which he had been promised was an apparatus to correct his deafness, but the promise had not been kept; and notwithstanding the fact that Gregorio Torres testified categorically that Iglesias and Peña spoke in low tones and that the words "he fell for it" were so spoken, still Sabalier says that he distinctly heard this phrase used expressly to signify all of the infernal and fraudulent purposes of Iglesias and Peña.

Sabalier and Torres do not agree as to the reason alleged in the complaint for the signing of the document by Sabalier, and representations should be proved substantially as alleged. 27 C. J. p. 40, sec. 165.

Encina, an eye-witness, in no manner corroborates the testimony of Sabalier and Torres concerning the simulations used for obtaining the consent of the former, but on the contrary, she tacitly denied that the facts occurred as related by them.

Likewise, no weight can be given to the testimony of the two other witnesses, Quiñones and Saldaña. These witnesses were eager to say so much that they rather contradicted the testimony of the plaintiff and of Torres by saying that the conversation was carried on in such loud tones that it could be heard from where they were standing. These witnesses were some distance away (they were on the opposite sidewalk) and could hear only what was spoken in loud tones; but Gregorio Torres, who was in Sabalier's house near Iglesias and Peña, testified that they were conversing in low tones, thus contradicting the testimony of the said two

witnesses, who, besides, did not agree upon the words uttered by Iglesias in reply to Peña. Furthermore, fraud partakes of the nature of a crime, and as such and for the purpose intended, is sought to be perpetrated in the dark, while the testimony of these witnesses was equivalent to saying that Iglesias and Peña committed their crime publicly, in broad daylight, without fear of informing the whole world of the conspiracy and fraudulent means employed to deceive the plaintiff and obtain his consent to the sale.

There is another circumstance which renders that testimony suspicious. We refer to the testimony of Sabalier and Gregorio Torres as to the time when the document was signed. It is dated April 30, 1920. On May 22, 1920, the deed of sale was executed in favor of the bank. It seemed decisive of the plaintiff's contention to make it patent that the said document, which preceded the sale, was, however, posterior to it, and Sabalier said repeatedly in the first part of his testimony that the said document was signed in January of 1921. Yet it was proved by the testimony of Ramón A. Nadal, agent of the New York & Porto Rico Steamship Co., that on December 29, 1920, Santiago Iglesias embarked for the United States and did not return until the month of March of the following year. After a recess of the court for three or four days Sabalier corrected the date, but the testimony of Gregorio Torres on that point remained unchanged and so appeared in a certain document signed by the said Torres in the name of Sabalier and addressed to the Governor of Porto Rico, complaining of the facts of this case.

Is this, then, the strong, clear and satisfactory proof to which the jurisprudence refers?

We consider the testimony of the witnesses that we have examined so discredited that it is impossible to sustain the conclusion of the trial court in this regard, and for similar reasons we may repeat in this case the reasoning applied by this Supreme Court in the case of *Gordils* v. *Successors*

*of Frontera,* 21 P.R.R. 213, 216. In that case it was sought to annul a power of attorney and a mortgage, the theory of the complaint being that the power was signed by the principal by virtue of a fraudulent artifice of the attorney in fact in conspiracy with a mercantile partnership. And after examining the evidence which in certain respects is in fact similar to that of the instant case, this court held:

"In our opinion the foregoing evidence is not sufficient to justify the conclusion that the power of attorney was executed by fraud or misrepresentation. Proof of fraud must always be conclusive, and the testimony of the two witnesses, together with that of the plaintiff, Romana Gordils, does not show that when she signed the document she did not know that she was signing a power of attorney in favor of Vázquez Caraballo, for the testimony of witnesses Rivera and Torrellas is not sufficient and therefore we cannot agree with that part of the judgment which decrees the nullity of the deed on the ground of fraud."

Likewise, we may say the same as to the character of the parol evidence in this case that this court said in the case of *Martínez* v. *Rodríguez,* 26 P.R.R. 5, 10, in which the object was to annul a will for fraud in its making:

"If deeds of land or renunciation of rights could be subsequently annulled by testimony of the character here presented the number of attacks that could be made on notarial deeds would be unlimited and the acquisition of property would be rendered uncertain. The rule of law is otherwise. For similar reasoning the case of *Cruz* v. *López,* 17 P.R.R. 40, is applicable, and so are the cases of *Torres Zayas* v. *Lothrop, Luce & Company,* 16 P.R.R. 172; 231 U. S. 171."

[3] (*b*) It was unimportant, however, at least in so far as the Bank of San Juan was concerned, whether or not Sabalier signed the private document which he attacks as fraudulent. He had executed before notary José E. Benedicto a power of attorney to Iglesias which conferred upon him sufficient power for the alienation of real property. Yet it is alleged in the complaint that these powers were

limited by private instructions of the principal and in this connection it was attempted to prove also the manner in which the power originated, i. e., that it was obtained at the instigation of the agent by the influence over the principal of his personal ideas regarding social questions, by which influence he had won the confidence of the plaintiff, finally obtaining great ascendency or suggestive power over him. This is the first indication of suspicion, or the doubtful link in the chain of presumptions upon which the whole structure of this matter has been erected. Sabalier himself explained his personal relations with Iglesias for more than twenty years. They were associates in their belief in the same ideals. But we do not see that from such relations, however intimate they may have been, or from such community of ideas, a fraudulent consequence can be derived. In the case of *Ana María Sugar Co., v. Castro,* 28 P.R.R. 225, this matter is dealt with and it was said:

"The appellees, and especially Castro and del Moral, were intimate friends. Of this there is no doubt, but neither friendship nor relationship is sufficient by itself to prove fraud or conspiracy."

Contrary to the merely suspicious character of this contention of the plaintiff was the documentary evidence which was not rebutted by the plaintiff. First the letter from Sabalier to Iglesias of September 16, 1916, inviting him to accept the power, and then the power itself solemnly executed as a strictly personal act before notary José E. Benedicto, the authenticity and execution of which are admitted by the plaintiff.

Moreover, neither the complaint nor the evidence indicates that the private instructions alleged to have been given by the plaintiff to his attorney in fact limiting his powers as regards the sale of property were known by the Bank of San Juan, and for this defendant, therefore, it was unimportant whether or not Sabalier had actually given such instructions. This question was decided several years

ago by this Supreme Court in the case of *Finlay* v. *Finlay,* 8 P.R.R. 371, in which the following was held:

"An agreement entered into by an agent binds his principal, it being immaterial in a judicial proceeding whether he has or has not exceeded his authority when in the power of attorney no limitation has been placed upon the agent  *  *  *." (Syl.)

And likewise other American authorities hold:

"While as between the principal and the agent the scope of the latter's authority is that authority which is actually conferred upon him by his principal, which may be limited by secret instructions and restrictions, such instructions and restrictions do not affect third persons ignorant thereof;  *  *  *." 2 C. J. 570.

(*c*) We are well aware, however, that the attempt to prove the manner in which the power was obtained was made in connection with other incidents tending to show the development of intelligent means for preparing and framing the idea of the fraud. For example, the advanced age of ninety years of the plaintiff when he executed the power, and the conclusion of the lower court on this point was that because of his age Sabalier's mental powers were weakened, meaning to say, therefore, that Iglesias could control the will of Sabalier. We all know that there is a time in our lives when the progress of age carries with it a decrease in our energy and mental faculties. We describe a parabola and after ascending descend. In this senile descent it is a sad fact that the brain functions are debilitated, the senses are dulled and the lack of their perfect physiological activity rends little by little the bonds that bound us to the pleasures of life. And although none can escape this inexorable law, still it is true that many human beings at the advanced age of Sabalier preserve with clear and apparent vigor their mental powers and some, if not all, of their senses. And this is the case with Sabalier. The vivacity of mind with which he testified at such length at the trial is remarkable, and it is also aston-

ishing with what ability he defended himself under the heavy fire of cross-examination. He was careful, after stating categorically that he had signed exhibit J on January 21, 1921, to correct that date, as said before; he was cautious, upon being asked by counsel for the appellants which of two documents shown to him was the one that he had signed at the instance of Iglesias for the International, to say that if they were shown to him on the next day he would answer, and, finally, in order to demonstrate the clearness of his sight, he said to the same attorney: "I can see well; do you want to show me a bag of gold coins? I remember my signature and I can see it." But in any event the capacity of Sabalier was not brought in issue and it has not been shown in any way that he was not in the full possession of his mental faculties.

(*d*) On the day following the execution of the power Sabalier made a will in which he designated as his heirs the children of Iglesias and other persons. The originals of the will and of the power of attorney were admitted in evidence over the objection of the defendants.

It seems that this evidence was introduced for a dual purpose: 1st, to strengthen the presumption of the suggestive power of Iglesias over Sabalier in explanation of his designation of the former's children as heirs to a part of his estate; and, 2nd, to show the participation of Peña, who is said to have drafted the said documents. Notwithstanding the objection of the appellants to the admission of this evidence, we feel bound to say that its effect was adverse to the plaintiff. The will is a strictly personal act, as is also the power. Notary José E. Benedicto said that both instruments were executed before him and that on the day of the execution of the power he was given the data in Sabalier's presence for the will, which he signed on the following day. It is interesting to note, however, that Sabalier did not remember in his testimony whether he signed the will, but rather denies that he did in saying: "He (re-

ferring to Iglesias) spoke to me about a will to include his family and I told him that I would not despoil my family in order to favor his  *  *  *." This incident brings into question the notary's good faith, albeit the execution of the document is not in controversy. The fame and reputation of notary Benedicto are beyond all doubt and the only end attained by this evidence was to discredit once more the veracity of the plaintiff in this case.

It is well to observe in connection with this evidence that in referring to the will with the evident intention of establishing more firmly the intervention of labor leaders in the acts of the conspiracy, the trial court fell into the serious error of finding that Prudencio Rivera Martínez and Rafael Alonso were among the witnesses to the will, when the fact is that neither of them was a witness to the instrument, the witnesses being Angel Rolán, José Fernández Pérez and Leoncio Figueroa.

(*e*) Another fact on which the plaintiff bases his allegation of fraud, is that the purchase price of the property was fixed at $26,877, which is less than half of the actual value of the property.

As a general proposition there is no presumption of fraud because a price less than the market value was paid. If this conclusion were adopted a sale not open to attack as fraudulent would be rare. Of course, if it should appear in any way that the difference between the price paid and the actual value of the property was received by the defendants, the existence of fraud would be evident; but neither directly nor indirectly has anything been shown to that effect, for even referring to the year 1920 when the sale was made, to the part of the property actually in the possession of Sabalier and to the sum at which it was assessed ($9,070) for the payment of taxes, the price could not be considered inadequate. In 1920 the Melilla property was not urbanized and the value of the land, according to experts, fluctuated between fifty cents and three dol-

lars per square meter, according to the location, and although the area appeared in the title deed as 98,000 meters, yet Sabalier had material possession of only a third of it, or perhaps less. A part of the property was claimed by the Government of Porto Rico and concerning the justness of this claim the record contains the following:

"Defendant's attorney to the witness: How did the Government of Porto Rico make this claim? Witness: In the first place it claims it now and when they wanted to erect houses it would not permit it * * *.

"Plaintiff: I object to the question and move that the answer be stricken out because this is not the proper way to prove that fact. Let him bring the Government of Porto Rico to show how it claims that, or what title the Government has; but by the simple testimony of the witness we can not prove the title of the Government of Porto Rico. The fact is that the property belongs to Sabalier and until there is a final judgment it will continue to belong to him.

"Judge: The objection is overruled. The witness says that by virtue of a claim of the Government of Porto Rico that was in litigation and, therefore, was not under his control, and the court may add that not very long ago an injunction proceeding was heard in this court in that connection. You may proceed."

[4] All of these circumstances appear to have been taken into account in carrying out the transaction and it becomes unnecessary that we should scrutinize all of the possible motives or intentions of Iglesias, for his testimony, although interested, should be believed until some legal reason is given or some facts are shown to destroy it, and this not having been done, he is entitled, inasmuch as fraud is not presumed, to the benefit of any reasonable theory that may be consistent with honesty. *Ana María Sugar Co.* v. *Castro, supra.*

Perhaps the ideas and also the motives of Iglesias in the transaction were mistaken. It is more than probable, however, that the majority of owners who sold their properties in San Juan five or ten years ago did so knowing that the

value of land in San Juan would continue to increase. Even considering the future, this is a matter of chance depending on the rise and fall of prices and from this circumstance no indication of fraud can be deduced.

(*f*) It was alleged in the complaint that after exhibit J had been signed Iglesias and Peña never informed Sabalier of the sale of his property and that he had no actual knowledge of it until the 28th of June, 1921, or sixteen days before this action was brought.

However, the testimony of Sabalier himself showed otherwise. He first said that he was told of it by the carpenters who built his house, which was constructed with the proceeds of the sale and during the year 1920. Afterwards he said that he knew about it from the bank's collector, and on cross-examination he said:

"I said to Abella that I first knew of the sale of my property from a girl named Josefa Verdejo * * * this year it could not be; it was in the year 1920."

But leaving aside the different sources from which Sabalier said he was informed of the sale, there is uncontradicted documentary evidence that Sabalier had such knowledge before and after the execution of the deed of sale to the Melilla property. The document reads as follows:

"Condition of the properties of Bernabé Sabalier on December 19, 1920.—On April 30, 1920, we had the offer from the Bank of San Juan for the purchase of all of the lots for a sum possibly greater than $20,000, and in accordance with the proceeding we sold to the Bank of San Juan under the specific conditions that the said bank should pay us interest at the rate of 6 per cent per annum on mortgages, payable monthly. The promissory notes were to be for $3,000 each.

"This financial transaction was profitable to us and it was specially necessary and urgent in order to escape the increase in taxes, the crisis of the rents, the deficit between our income and our expenses and the impossibility of raising the rents of the poor people who were a majority of the occupants of the lots, many of whom owed the monthly instalments of rent for one year. On the

other hand, it was impossible for us to speculate upon the poverty of the tenants of the Melilla property. Besides, the dwelling of my principal, Bernabé Sabalier, needed reconstruction and the interest paid by the bank monthly is sufficient to support him economically and also to provide resources for such extra expenses and personal obligations as he may have. One of the important reasons for the sale was the debt of $4,000 contracted with the Popular Bank which bore interest of $40 monthly.

"The condition of the properties after paying the mortgage of the Popular Bank and the professional fees of our attorney for services rendered in the last few years and those that he may render in the future, is as follows:

| | |
|---|---|
| "Promissory note due in June, 1921_____ | $3000. 00 |
| "Promissory note due in June, 1922_____ | 3000. 00 |
| "Promissory note due in June, 1923_____ | 3000. 00 |
| "Promissory note due in June, 1924_____ | 3000. 00 |
| "Promissory note due in June, 1925_____ | 3000. 00 |
| "Promissory note due in June, 1926_____ | 2375. 00 |
| "One hundred shares of the Bank of San Juan_____ | 500. 00 |
| "Five shares of the Compañía Editora de Justicia___ | 50. 00 |
| "Ten bonds of the Temple of Labor_____ | 100. 00 |
| "Lot and house where Bernabé Sabalier lives—value after reconstruction_____ | 3000. 00 |
| "Cash value of his property at the end of the year 1920 _____ | $20525. 00 |

"In view of the suggestion of my principal, Bernabé Sabalier, for obtaining today the sum of $1,200 and for the purpose of totally rebuilding the house in which he lives, fencing in the lot and putting the property in conditions of sanitation and comfort entirely in accordance with his needs, I have made a transaction with the Successors of A. Mayol & Co. for materials and another with Bolívar & Aboy Vidal, and for these expenses I have disposed of, with the consent of my principal, the mortgage which falls due in June of 1921 for the sum of $3,000, of which I have handed to Sabalier $1,200, leaving the rest to cover the expenses of the construction of the house as far as it may go; and for the information of my principal, Sabalier, I make this explanation without prejudice to making it more exact at any time. Bernabé Sabalier has read this explanation on this day and accepts its contents.—(Signed) Bernabé Sabalier. (Signed) Santiago Iglesias."

Sabalier acknowledged his signature to this document, which implies an acknowledgment of the sale. We find

nothing in the record casting the least shadow upon its execution or showing that Sabalier signed it under any unlawful or fraudulent inducement.

The evidence offers other considerations that need not be examined in view of the premises established.

However, it may be well to say in passing that witness Antonia Fernández plays a very important role in this suit. She, a sister of Sabalier (*sic*), substituted Iglesias. She received a power of attorney and was designated as an heir shortly before the bringing of the action. It is enough to refer to her testimony to the effect that being the owner of a small house situated on land of the Melilla property, she paid the bank, after the execution of the deed of sale, rent for the use of the land. She read the monthly receipts given to her by the bank and when asked, "Did the receipts read that the bank held the property under a lease?" she replied: "I refer to the statements of the manager, Mr. Iglesias.

[5, 6] Furthermore, considering the number of merely presumptive circumstances deduced from the evidence with regard to the commission of the fraud and in order that we may see that recognized authorities have called attention to the risk which men, jurors and judges run in allowing their imagination to dominate them in the matter of fraud, it seems proper to cite the quotation from Moore on Facts made in the case of *Calzado v. Carrero,* 15 P.R.R. 340, in the opinion delivered by Mr. Justice MacLeary as illustrative and important in this case. It reads as follows:

"In a case where a will was contested on the ground that it was fabricated, but the jury rendered a verdict in favor of the will, Mr. Justice Grier addressed the jury as follows: 'You must remember that the burden of proof is on the party who alleges fraud. That fraud, though proved by circumstances, can never be presumed, for fraud is a crime. It is not enough to show suspicious circumstances. Suspicion is not proof. It does not require a great deal

of ingenuity to cast suspicion of fraud upon any transaction.   There is a very great and sometimes grievous error into which not only the public mind, but that of jurors and judges too, are apt to fall; and which leads to false judgments, and sometimes to great oppression.   I would, therefore, specially call the attention of the jury to it, and caution them to beware of it.   It is this: The law abhors fraud.   Every honest mind hates it, and even those who practice it themselves will join in the denunciation of it.   It makes them feel virtuous for the time, and they are the most ready, from the arguments of conscience, from judging of others by themselves, to believe it true, and inveigh most loudly against it.   When the clamor of fraud is raised in a community, or when it is confidently charged by counsel in a court, we are prone to see all facts through a false medium, which magnifies the importance of every fact upon which suspicion of fraud may be raised, and ignores the plainest inference against it.   In the midst of our virtuous indignation against fraud, we first assume it has been committed and then seek for arguments to confirm, not our judgments, but our prejudice.   ''Trifles, light as air,'' then become ''strong as proofs of holy writ,'' circumstances which to an unprejudiced mind are just as compatible with innocence as guilt, which at best could only raise a suspicion, are set down as conclusive evidence of crime.   Those who sit in judgment over men's rights, whether as courts or jurors, should beware of this natural weakness to which we are almost all of us subject.   We all fancy ourselves wiser than perhaps others are willing to give us credit for.   This feeling is gratified by what we believe to be superior sagacity.   Rogues may be cunning, but they can't deceive *us.*   Under this satisfactory belief, we become over-astute, and often see that which is not to be seen.   We suffer our imaginations to take the rein from our judgments, and rush headlong in this chase after the fox called fraud.   Circumstances which should avail for the proof of fraud are such only as are inconsistent with a contrary view of the transaction, and lead irresistibly to that conclusion.' ''

It remains to be said only that the counter-complaint of defendant Iglesias claiming pay for his services as attorney in fact of the plaintiff and manager of his properties is not supported by the evidence.   Section 1613 of the Civil Code provides that the agency is presumed to be gratuitous and this presumption has not been destroyed by an agreement of the parties to the contrary.

By virtue of all of the foregoing the judgment of the trial court must be reversed in so far as it sustains the complaint and affirmed in its dismissal of the counter-complaint, without special imposition of costs.